Kristen K. Waggoner
WA Bar No.27790
AZ Bar. No. 32382
Katherine Anderson
WA Bar No. 41707
AZ Bar No. 29490
Ryan Tucker*
AZ Bar No. 034382
Mark Lippelmann*
AZ Bar No. 036553
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
kwaggoner@ADFlegal.org
kanderson@ADFlegal.org
rtucker@ADFlegal.org
mlippelmann@ADFlegal.org

Eric Kniffin*
CO Bar No. 48016
KNIFFIN LAW
102 S. Tejon St., Suite 1100
Colorado Springs, CO 80903
Telephone: (719) 212-4391
eric@kniffin.law

George M. Ahrend
WA Bar No. 25160
AHREND LAW FIRM
421 W. Riverside Ave., Suite 1060
Spokane, WA 99201
Telephone: (206) 467-6090
George@luveralawfirm.com
*Counsel for Plaintiffs*

*Motion for *Pro Hac Vice* admission
filed concurrently

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ORTHODOX CHURCH IN AMERICA; ANTIOCHIAN ORTHODOX CHRISTIAN ARCHDIOCESE OF NORTH AMERICA; ROMANIAN ORTHODOX METROPOLIA OF THE AMERICAS; WESTERN AMERICAN DIOCESE OF THE RUSSIAN ORTHODOX CHURCH OUTSIDE OF RUSSIA; TIMOTHY WILKINSON, | Case No. |
| *Plaintiffs*, | **COMPLAINT** |
| v. | |
| ROBERT W. FERGUSON, in his official capacity as Governor of the State of Washington; | |

Complaint – 1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

NICHOLAS W. BROWN, in his official capacity as Attorney General of the State of Washington; LARRY HASKELL, in his official capacity as Spokane County Prosecuting Attorney; JOSEPH BRUSIC, in his official capacity as Yakima County Prosecuting Attorney; LEESA MANION, in her official capacity as King County Prosecuting Attorney; RANDY FLYCKT, in his official capacity as Adams County Prosecuting Attorney; CURT LIEDKIE, in his official capacity as Asotin County Prosecuting Attorney; ERIC EISINGER, in his official capacity as Benton County Prosecuting Attorney; ROBERT SEALBY, in his official capacity as Chelan County Prosecuting Attorney; MARK NICHOLS, in his official capacity as Clallam County Prosecuting Attorney; TONY GOLIK, in his official capacity as Clark County Prosecuting Attorney; DALE SLACK, in his official capacity as Columbia County Prosecuting Attorney; RYAN JURVAKAINEN, in his official capacity as Cowlitz County Prosecuting Attorney; GORDON EDGAR, in his official capacity as Douglas County Prosecuting Attorney; MICHAEL GOLDEN, in his official capacity as Ferry County Prosecuting Attorney; SHAWN SANT, in his official capacity as Franklin County Prosecuting Attorney; MATHEW NEWBERG, in his official capacity as Garfield County Prosecuting Attorney; KEVIN McCRAE, in his official capacity as Grant County Prosecuting Attorney; NORMA TILLOTSON, in her official capacity as Grays Harbor County Prosecuting Attorney; GREG BANKS, in his official capacity as Island County Prosecuting Attorney; JAMES KENNEDY, in his official capacity as Jefferson County Prosecuting Attorney; CHAD ENRIGHT, in his official capacity as Kitsap County Prosecuting Attorney; GREG ZEMPEL; in his official capacity as Kittitas County Prosecuting Attorney; DAVID

Complaint – 2

QUESNEL, in his official capacity as Klickitat County Prosecuting Attorney; JONATHAN MEYER, in his official capacity as Lewis County Prosecuting Attorney; TY ALBERTSON, in his official capacity as Lincoln County Prosecuting Attorney; MICHAEL DORCY, in his official capacity as Mason County Prosecuting Attorney; ALBERT LIN, in his official capacity as Okanogan County Prosecuting Attorney; MICHAEL ROTHMAN, in his official capacity as Pacific County Prosecuting Attorney; DOLLY HUNT, in her official Capacity as Pend Orielle County Prosecuting Attorney; MARY ROBNETT, in her official capacity as Pierce County Prosecuting Attorney; AMY VIRA, in her official capacity as San Juan County Prosecuting Attorney; RICH WEYRICH, in his official Capacity as Skagit County Prosecuting Attorney; ADAM KICK, in his official capacity as Skamania County Prosecuting Attorney; JASON CUMMINGS, in his official capacity as Snohomish County Prosecuting Attorney; ERIKA GEORGE, in her official capacity as Stevens County Prosecuting Attorney; JON TUNHEIM, in his official capacity as Thurston County Prosecuting Attorney; DANIEL BIGELOW, in his official capacity as Wahkiakum County Prosecuting Attorney; GABRIEL ACOSTA, in his official capacity as Walla Walla County Prosecuting Attorney; ERIC RICHEY, in his official capacity as Whatcom County Prosecuting Attorney; and DENIS TRACY, in his official capacity as Whitman County Prosecuting Attorney,

*Defendants.*

Complaint – 3

## NATURE OF THE ACTION

1.     The forgiveness of sins is at the heart of Jesus' ministry on earth. For 2,000 years, his priests have testified to Jesus' love and mercy by preaching "repentance and forgiveness of sins … in his name to all nations." Luke 24:47. Following Jesus' instruction to his disciples, the Sacrament of Confession in the Orthodox tradition has been entrusted to the ordained priesthood. In accordance with church history, tradition, liturgy, and law, this ministry has taken the form of the Sacrament of Confession, also called the Holy Mystery of Repentance, or more simply Confession.

2.     Since at least the fourth century AD, the Christian Church has consistently prohibited priests from disclosing what they hear in Confession. The Orthodox Church today teaches that priests have a strict religious duty to maintain the absolute confidentiality of what is disclosed in the Sacrament of Confession. Violating this mandatory religious obligation is a canonical crime and a grave sin, with severe consequences for the offending priest, including removal from the priesthood.

3.     The Christian tradition teaches that the priests must maintain the confidentiality of Confession first because priests' role in the sacrament is to mirror God's love and mercy, including the Bible's promise that "as far as the east is from the west, so far has he removed our sins from us." Second, the confidentiality of Confession reflects the

1  Church's recognition that people are unlikely to come to the sacrament

2  and receive God's mercy and forgiveness if they fear that their priests

3  will share their sins with others.

4      4.    Every state, including Washington, honors the clergy-

5  penitent privilege, and the United States Supreme Court recognizes

6  that the privilege has long been part of the common law tradition.

7      5.    Also, like every other state, Washington has a mandatory

8  reporter law that imposes a legal duty on certain persons to file a report

9  with the government when one has reasonable cause to believe that a

10  child has suffered abuse or neglect.

11      6.    And, like nearly every other state, Washington's mandatory

12  reporter law has recognized a clergy-penitent privilege that protects the

13  confidentiality of Confession.

14      7.    But this May, Washington passed SB 5373, which includes

15  the *Clergy Discrimination Clause* (RCW § 26.44.030(1)(b)) that makes it

16  a crime for priests to fulfill their religious obligation to keep confessions

17  confidential:

18  | 11   service. ((No)) Except for members of the clergy, no one shall be
19  | 12   required to report under this section when he or she obtains the
     | 13   information solely as a result of a privileged communication as
     | 14   provided in RCW 5.60.060.

20      A single violation can carry up to 364 days in jail, a $5,000 fine,

21  and civil liability.

22

23

Complaint – 5

8.     That means the *Clergy Discrimination Clause* puts priests, and only priests, to a Hobson's choice: they must either obey Washington law and violate their sacred obligation to maintain the confidentiality of Confession, or else uphold their religious vow and face criminal penalties.

9.     Furthermore, as Christian pastors have warned since at least the fifth century AD, the specter that priests might report people's confessions to the government chases people away from the Sacrament of Confession, and thus God's mercy and forgiveness.

10.    Yet Washington still honors secular privileged communications as valid exceptions to its mandatory reporter law.

11.    Legislators were careful to ensure Washington's mandatory reporter law does not infringe an attorney's professional obligation to keep client matters private. But the *Clause*'s prime sponsor, Senator Noel Frame, argued churches ought to "change their rules" about the confidentiality of Confession, "not insist that we change our state laws."

12.    And Washington has also retained privileges for sexual assault advocates and alcohol or drug recovery sponsors that exempt them from the mandatory reporting law.

13.    Washington has made itself an outlier. It is now the only state whose mandatory reporter law explicitly overrides the religious clergy-penitent privilege while leaving the secular attorney-client privilege (and other secular privileges) intact.

14.    Plaintiff Orthodox Christian Churches and Plaintiff Orthodox Priest bring this action seeking injunctive and declaratory relief from the *Clergy Discrimination Clause*.

15.    Plaintiffs do not object to alerting authorities when they have genuine concerns about children that they learn outside of Confession—indeed, Plaintiff Priest and other clergy are already required to make such reports under their own bishops' policies.

16.    Plaintiffs request only that the State give the clergy-penitent privilege the constitutional protection it is due as a fundamental religious obligation.

**JURISDICTION AND VENUE**

17.    This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought pursuant to 42 U.S.C. § 1983.

18.    This Court has jurisdiction over the instant matter pursuant to 28 U.S.C. §§ 1331 and 1343.

19.    This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, implemented through Rule 57 of the Federal Rules of Civil Procedure.

20.    This Court is authorized to grant Plaintiffs' prayer for temporary, preliminary, and permanent injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

21.    This Court is authorized to grant Plaintiffs' prayer for relief regarding costs, including a reasonable attorney's fee, pursuant to 42 U.S.C. § 1988.

22.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because several County Prosecuting Attorney Defendants reside in this district and all Defendants reside in this State and because a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred in the Eastern District of Washington.

## THE PARTIES

### *Plaintiffs*

23.    The Orthodox Church traces its origins to the earliest followers of Jesus Christ. It is organized as a fellowship of self-governing (autocephalous) churches, each led by its own bishops, but united by shared convictions, history, and traditions. While each of the Plaintiff Churches described below is independent in its administration, they are in communion with each other and cooperate on matters of mutual concern. They share the same religious beliefs about the Sacrament of Confession, as discussed below.

24.    Plaintiff Orthodox Church in America (OCA) is autocephalous, and therefore the only Orthodox Church serving in the United States not overseen by an Orthodox Church rooted in another part of the world.

25.    The OCA's Diocese of the West is the geographical district within the OCA that includes the western United States. It has parishes and missions in Washington State. The Diocese of the West is led by Archbishop Benjamin. The Archbishop is the spiritual father of all priests and parishes in his Diocese.

26.    The OCA and Archbishop Benjamin have a religious duty to ensure that their priests maintain the confidentiality of Confession and that the Christian faithful under their care have access to the Sacrament of Confession, offered consistent with the traditions and teachings of the Orthodox Christian faith.

27.    Plaintiff OCA brings this action on behalf of itself and all its priests and faithful in Washington State.

28.    Plaintiff Antiochian Orthodox Christian Archdiocese of North America is an Archdiocese of the Antiochian Orthodox Church. The Archdiocese has parishes and missions in Washington State.

29.    The Archdiocese is led by Metropolitan Saba. The Metropolitan is the spiritual father of all priests and parishes in his Archdiocese.

30.    The Archdiocese and Metropolitan Saba have a religious duty to ensure that their priests maintain the confidentiality of Confession and that the Christian faithful under their care have access to the Sacrament of Confession, offered consistent with the traditions and teachings of the Orthodox Christian faith.

31.     Plaintiff Archdiocese brings this action on behalf of itself and all its priests and faithful in Washington State.

32.     Plaintiff Romanian Orthodox Metropolia of the Americas is an Archdiocese of the Romanian Orthodox Church. It has parishes in Washington State.

33.     The Metropolia is led by Metropolitan Nicolae. The Metropolitan is the spiritual father of all priests and parishes in his Archdiocese.

34.     The Metropolia and Metropolitan Nicolae have a religious duty to ensure that their priests maintain the confidentiality of Confession and that the Christian faithful under their care have access to the Sacrament of Confession, offered consistent with the traditions and teachings of the Orthodox Christian faith.

35.     Plaintiff Metropolia brings this action on behalf of itself and all its priests and faithful in Washington State.

36.     Plaintiff Western American Diocese of the Russian Orthodox Church Outside of Russia is a Diocese of the Russian Orthodox Church. It has parishes in Washington State.

37.     The Diocese is led by Archbishop Kyrill. The Archbishop is the spiritual father of all priests and parishes in his Diocese.

38.     The Diocese and Archbishop Kyrill have a religious duty to ensure that their priests maintain the confidentiality of Confession and that the Christian faithful under their care have access to the

Complaint – 10

Sacrament of Confession, offered consistent with the traditions and teachings of the Orthodox Christian faith.

39.    Plaintiff Western American Diocese of the Russian Orthodox Church Outside of Russia brings this action on behalf of itself and all its priests and faithful in Washington State.

40.    The Plaintiff Churches' priests travel as needed to meet the spiritual needs of the Orthodox faithful throughout Washington State, including offering the Sacrament of Confession.

41.    Plaintiff Father Timothy Wilkinson is a priest in the Orthodox Church in America and serves as pastor of Saint Luke Orthodox Christian Church in Chattaroy, Washington. As a priest in the Orthodox Church in America, and as spiritual father to those he serves, Plaintiff Wilkinson has the faculties to, and does, hear the Sacrament of Confession in the State of Washington.

### *Defendants*

42.    Defendant Robert W. Ferguson is Governor of the State of Washington.

43.    As Governor, Defendant Ferguson holds the State of Washington's "supreme executive power." Wash. Const. art. III, § 2.

44.    As the State's supreme executive, Defendant Ferguson "shall see that the laws are faithfully executed," including the challenged SB 5375. Wash. Const. art. III, § 5.

45.    Defendant Ferguson also "supervise[s] the conduct of all executive and ministerial offices," including Defendant Attorney General.

46.    Defendant Ferguson "may require the attorney general to aid any prosecuting attorney in the discharge of the prosecutor's duties." RCW § 43.06.010(7).

47.    Defendant Ferguson may also issue a "written request" for Defendant Attorney General to "investigate violations of the criminal laws within this state." RCW § 43.10.090.

48.    At all times relevant to this Complaint, Defendant Ferguson is and was acting under color of State law. He is sued in his official capacity.

49.    Defendant Nicholas W. Brown is the Attorney General for the State of Washington.

50.    As Attorney General, Defendant Brown is "the legal advisers of the state officers," including Defendant Ferguson, and "shall perform other duties as may be prescribed by law." Wash. Const. art. III, § 21.

51.    As Attorney General, Defendant Brown "shall ... [c]onsult with and advise the several prosecuting attorneys in matters relating to the duties of their office, and when the interests of the state require, he … shall attend the trial of any person accused of a crime, and assist in the prosecution." RCW § 43.10.030(4).

1
2
3
4
5
6
7
8
9
10

52.     Defendant Attorney General, on request of Defendant Governor, "shall investigate violations of the criminal laws." RCW § 43.10.090. "If, after such investigation, the attorney general believes that the criminal laws are improperly enforced in any county, and that the prosecuting attorney of the county has failed or neglected to institute and prosecute violations of such criminal laws, either generally or with regard to a specific offense or class of offenses, the attorney general shall direct the prosecuting attorney to take such action in connection with any prosecution as the attorney general determines to be necessary and proper." *Id.*

11
12
13

53.     SB 5375 establishes a crime on which Defendant Brown shall advise the prosecuting attorneys how to enforce and assist in prosecutions under the law.

14
15
16

54.     At all times relevant to this Complaint, Defendant Brown is and was acting under color of State law. He is sued in his official capacity.

17
18
19
20
21
22
23

55.     Defendants Larry Haskel, Joseph Brusic, Leesa Manion, Randy Flyckt, Curt Liedkie, Eric Eisinger, Robert Sealby, Mark Nichols, Tony Golik, Dale Slack, Ryan Jurvakainen, Gordon Edgar, Michael Golden, Shawn Sant, Matthew Newberg, Kevin McCrae, Norma Tillotson, Greg Banks, James Kennedy, Chad Enright, Greg Zempel, David Quesnel, Jonathan Meyer, Ty Albertson, Michael Dorcy, Albert Lin, Michael Rothman, Dolly Hunt, Mary Robnett, Amy Vira,

Rich Weyrich, Adam Kick, Jason Cummings, Erika George, Jon Tunheim, Daniel Bigelow, Gabriel Acosta, Eric Richey, and Denis Tracy are the prosecuting attorneys for Spokane, Yakima, King, Adams, Asotin, Bentin, Chelan, Clallam, Clark, Columbia, Cowlitz, Douglas, Ferry, Franklin, Garfield, Grant, Grays Harbor, Island, Jefferson, Kitsap, Kittitas, Klickitat, Lewis, Lincoln, Mason, Okanogan, Pacific, Pen Orielle, Pierce, San Juan, Skagit, Skamania, Snohomish, Stevens, Thurston, Wahkiakum, Walla Walla, Whatcom, and Whitman Counties of Washington, respectively.

56.    As county prosecuting attorneys, these Defendants "shall … [p]rosecute all criminal and civil actions in which the state or the county may be a party," including failure to report under RCW § 26.44.030. RCW § 36.27.020(4). They are all sued in their official capacities.

## STATEMENT OF FACTS

## I.    The Plaintiffs and their Religious Duties regarding the Sacrament of Confession

57.    Each of the Plaintiff Churches teach that a priest cannot under any circumstances reveal what is confessed to him during the Sacrament of Confession. Plaintiff Wilkinson believes and follows this teaching. Yet that is exactly what Washington seeks to require, in direct violation of church doctrine and Plaintiffs' religious convictions.

Complaint – 14

## A.  The Sacrament of Confession is a central tenet of Plaintiffs' religious practice.

58.  The mission that Jesus left His Church is to bring about the salvation of every human person, uniting each to Christ in the Church, transforming each in holiness, and giving each eternal life. The Church's mission is to share the Gospel of Christ, the good news that Jesus is the Messiah, that He rose from the dead, and that we can be saved as a result.

59.  One of the central ways Jesus called his apostles to testify to His love was to preach "repentance and forgiveness of sins … in his name to all nations." Luke 24:47.

60.  The Bible records that Christ's apostles took up Christ's call. In the Book of Acts, the Apostle Peter says, "Repent and be baptized every one of you in the name of Jesus Christ for the forgiveness of your sins, and you shall receive the gift of the Holy Spirit." Acts 2:37-38.

61.  The Orthodox Christian tradition that all Plaintiffs share views the Christian sacraments, or "holy mysteries," as special events in the life of the Church through which God discloses Himself and his mercy through the prayers and actions of His people. Plaintiffs believe that the Christian sacraments are means, ordained by God, through which Christians encounter God's grace, His love, and the Risen Jesus Christ.

62.    One of those sacraments is the Sacrament of Confession, or the Holy Mystery of Reconciliation.

63.    The Orthodox Christian tradition likens the priest's role in administering the Sacrament of Confession to a doctor's role in helping the sick or wounded. In the words of Syriac teacher Aphrahat the Persian (d. 345 AD), as a person "wounded in battle is not ashamed to give himself into the hands of a skillful physician," so the person "whom Satan has smitten ought not to be ashamed to confess his sins, and depart from it, and entreat for himself the medicine of penitence."[1]

## B.    Overview of the Sacrament of Confession in the Orthodox Church

64.    Orthodox Christians are encouraged to come to the Sacrament of Confession regularly. Orthodox view Confession as an essential expression of the Christian faith and central to growth in the spiritual life, grounded in Jesus' call, "Repent, for the Kingdom of God is at hand!" It is seen as a routine part of the Christian life, a means by which Christians continually turn back to God and participate in the life God invites his people into through the transformative power of repentance and divine mercy.

65.    Thus, parishes often post regular times when priests are available for Confession, including for a period before or after Saturday

---

[1] Aphrahat the Persian, *Demonstrations VII: On Penitents*, trans. Frank H. Hallock, in J. of the Society of Oriental Research, v.16, ed. Samuel A.B. Mercher (1932) 44, https://doi.org/doi:10.7282/T32805SV.

evening Vespers. Outside of these set times, parishioners may make an appointment with a priest to receive the sacrament.

66.    In the Orthodox Christian tradition, Confession usually takes place standing in the church before an image of Jesus Christ, the Holy Gospels, or a crucifix. The priest typically stands or sits alongside the penitent, with both looking toward the image of Christ. This reminds both the priest and penitent alike that the sinner is not merely confessing to the priest, but truly to Christ himself.

67.    The Sacrament of Confession typically begins with prayer, the reading of Psalms, and sometimes the chanting of hymns, after which the priest then encourages the individual to repent. Confession in the Orthodox Christian tradition often involves not merely the listing of sins but also receiving spiritual advice from the priest, who as a spiritual father seeks to guide the penitent to virtue and holiness.

68.    As the Sacrament draws to a close, the priest says a prayer of absolution invoking God's forgiveness of the penitent's sins while blessing him with the sign of the cross.

69.    A central and fundamental aspect of the Sacrament of Confession is that the priest must never, under any circumstances, disclose the contents of a Confession.

70.    The Orthodox tradition demands that priests honor the absolute confidentiality of Confession for two reasons.

71.     First, priests must do so because they are called in the sacrament to mirror God's love and mercy, and the confidentiality of Confession is rooted in God's promises. Psalm 103 says, "as far as the east is from the west, so far has he removed our sins from us." The prophet Ezekiel promises, "if the wicked man turns away from all the sins he committed … none of the crimes he committed shall be remembered against him." Ezekiel 18:21. Plaintiffs proclaim the Word of God not just by repeating these words, but by living them out, most centrally when sinners unburden themselves in Confession.

72.     Second, the absolute confidentiality of Confession reflects the pastoral reality that breaking this confidentiality, or the fear that priests might violate this confidentiality, would result in people refusing to confess, thus depriving themselves of God's mercy.

73.     The earliest existing canon to deal with secrecy in Confession is the 34th Canon of Saint Basil the Great (d. 379), which noted that church fathers had "forbidden" priests from disclosing the identities of "women who have committed adultery and confessed" to protect them from retaliation.

74.     Pope Leo the Great (d. 461) likewise recognized that the confidentiality of Confession is necessary because disclosing others' sins would chill people from coming to Confession: "many" would "be kept away from the remedies of penance, either out of shame or for fear that

their enemies may come to know of facts which could bring harm to them through legal procedures."[2]

75.    Similarly, St. Dimitri of Rostov (d. 1709) emphasized the importance of ensuring the absolute confidentiality of Confession. Priests "must die and be crowned with a martyr's crown rather than unlock the seal of the confession." The Orthodox believe, in the words of St. Dimitri, that "it is better for the spiritual father to accept temporary death from people who kill his body but who cannot kill his soul than to be executed by God with a permanent death for the exposure."[3]

76.    Down the centuries, countless priests have honored this counsel, submitting to torture and death rather than yield to demands from tyrannical kings, military dictators, and civil authorities.[4]

77.    As St. Nicodemus of the Holy Mountain (d. 1809) writes to priests in his *Exomologitarion*, a classic treatise on how Orthodox Christians understand Confession: "Nothing else remains after

---

[2] J. Neuner & Jacques Dupuis, *The Christian Faith: In the Doctrinal Documents of the Catholic Church* 660 (7th ed. 2001) (quoting Pope Leo the Great, *Letter of the Bishops of Roman Rural Districts* (459)).

[3] Nadieszda Kizenko, *Good for the Souls: A History of Confession in the Russian Empire* 63 (2021).

[4] *See*, *e.g.*, Brian Fraga, *Why priests refuse to break the seal of confession*, OSV Newsweekly (May 15, 2019), https://www.osvnews.com/2019/05/15/the-seal-of-confession/; *These priests were martyred for refusing to violate the seal of confession*, Catholic News Agency (Dec. 16, 2017), https://www.catholicnewsagency.com/news/36651/these-priests-were-martyred-for-refusing-to-violate-the-seal-of-confession; Chaz Muth, *Priestly Martyrdom to Uphold Seal of Confession Not a New Phenomenon*, Orange County Catholic (June 5, 2019), https://www.occatholic.com/priestly-martyrdom-to-uphold-seal-of-confession-not-a-new-phenomenon/.

confession, Spiritual Father, except to keep the sins you hear a secret, and to never reveal them."[5]

78.     To this day, the Orthodox Church continues to reinforce these ancient teachings and insist that the confidentiality of Confession is absolute and that its violation is a grave sin.

79.     According to the Orthodox Church in America's Guidelines for Clergy,

> The secrecy of the Mystery of Penance, even under strong constraining influence, is considered an unquestionable rule in the entire Orthodox Church. Betrayal of the secrecy of confession will lead to canonical punishment of the priest.[6]

80.     Canonical punishment for this offense includes suspending a priest's faculties and even permanently reducing the priest to the lay state.

81.     Plaintiffs cannot remove or qualify the confidentiality of Confession by passing new canon laws or guidelines. Indeed, the Orthodox Church has no mechanism for "updating" the received tradition of the Church.

**C.     Plaintiffs are committed to appropriately preventing and reporting crimes.**

82.     Plaintiffs are committed to protecting children.

---

[5] Nikodemos the Hagiorite, *Exomologetarion: A Manual of Confession* (trans. Fr. George Dokos 2006).

[6] Holy Synod of the Orthodox Church in America, *Guidelines for Clergy* 17 (2023), https://www.oca.org/files/PDF/official/2023-OCA-Guidelines-for-Clergy.pdf.

83.     Plaintiff Antiochian Orthodox Christian Archdiocese of North America's has a Youth Protection Policy, which is binding for Church leaders, including clergy, administrators, staff, and volunteer youth workers.[7]

84.     These commitments are representative of the commitments made by each Plaintiff.

85.     This Youth Protection Policy requires all Church personnel and volunteers to report any reasonable suspicion of abuse or neglect to law enforcement.[8]

86.     The only exception to the Policy is that clergy must not break the confidentiality of Confession.

87.     Under the Policy, anyone alleged to have committed acts that warrant reporting to authorities must be immediately suspended from participating in any youth programs and all activities related to youth. Pending the results of investigation by law enforcement, such persons may be suspended from church activities and church attendance.[9]

---

[7] *See* Antiochian Orthodox Christian Archdioceses of North America, *Youth Protection Policy: Church Leaders, Administrators, Staff and Volunteer Youth Workers* (2024), https://antiochianprodsa.blob.core.windows.net/websiteattachments/ YOUTH%20PROTECTION%20POLICY.pdf

[8] *Id*. at 23.

[9] *Id*. at 27.

88.     Under the Policy, the failure to report relevant information learned outside of the confidentiality of Confession results in discipline, including termination from employment or volunteer positions.[10]

89.     Though the confidentiality of Confession is absolute, Orthodox priests are taught that pastoral concern for the penitent and others in the penitent's life may warrant encouraging the penitent to initiate a conversation with the priest outside of the sacrament or to take steps to address damage related to a confessed sin.

90.     For example, the Orthodox Church in America's *Guidelines for Clergy* states:

> In rare circumstances, for the sake of the salvation of the one coming to the mystery, the priest may withhold absolution for a short time and ask the penitent to take concrete steps to make amends as an expression of repentance.[11]

91.     The possibility of a priest temporarily withholding absolution is related to the priest's responsibility to look for signs that the sinner is genuinely repentant for his or her sins.

92.     Priests have the responsibility to determine these "rare circumstances," which is a spiritual question entrusted to the confessor in his pastoral judgment.

---

[10] *Id.*

[11] *Guidelines for Clergy*, Orthodox Church in America, *supra* note 6, at 18.

Complaint – 22

93.    The priest will consider how best to minister to the penitent and help the penitent reconcile himself with God and other affected persons.

94.    One "rare circumstance[ ]" could include when a penitent has confessed a grave sin that is also criminal like child abuse. Part of making amends for that sin could include asking the penitent to make a report to law enforcement.

95.    According to Archpriest Maxim Nikolsky, General Synod Ecumenical Representative from the Russian Orthodox Church:

> In the case of a very grave sin the priest must make every effort to encourage the sinner to pursue an appropriate legal action. . . . So no prayer of absolution is offered where there is clearly no repentance as when murder or paedophilia has been committed and the person confessing has no intention of giving himself up to the legal authorities.[12]

## II.    Washington amends its mandatory reporter law to revoke the relevant clergy-penitent privilege.

### A.    The clergy-penitent privilege is a venerable part of our legal system.

96.    The clergy-penitent privilege—like the attorney-client privilege—is a deeply rooted part of our legal system that guards fundamental religious and privacy interests.

---

[12] Archpriest Maxim Nikolsky, *Reflections on the Seal of the Confessional in the Russian Orthodox Church* (Jan. 29, 2016), https://www.churchofengland.org/sites/default/files/2019-05/russian-orthodox-church-submission.pdf.

97.    Every State, including Washington State, recognizes the clergy-penitent privilege.

98.    For 150 years, the United States Supreme Court has recognized the clergy-penitent privilege as part of the common law tradition. *See Totten v. United States*, 92 U.S. 105, 107 (1875) ("[S]uits cannot be maintained which would require a disclosure of the confidences of the confessional.").

99.    The Supreme Court has also affirmed that the clergy-penitent privilege, like the attorney-client privilege, serves fundamental privacy interests. *See Trammel v. United States*, 445 U.S. 40, 51 (1980) ("The priest-penitent privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return.").

100.    The Ninth Circuit has likewise concluded that "the inviolability of religious confession to the clergy" is "the law of the land, the expectation of every repentant sinner, and the assured confidence of every minister of God's grace." *Mockaitis v. Harcleroad*, 104 F.3d 1522, 1533 (9th Cir. 1997), *overruled on other grounds by City of Boerne v. Flores*, 521 U.S. 507 (1997).

101.    Washington's privileged communications statute recognizes the clergy-penitent privilege. RCW § 5.60.060(3).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

### B.    SB 5375 amends Washington's mandatory reporter law to target clergy.

102.    For decades, Washington State has had a mandatory reporter law that requires certain people, such as doctors, law enforcement officers, and school personnel, to inform public authorities when they have "reasonable cause to believe that a child has suffered abuse or neglect." RCW § 26.44.030(1)(a).

103.    For nearly two decades, Washington law has explicitly exempted information learned from privileged communications from its mandatory reporting law: "No one shall be required to report under [the mandatory reporter law] when he or she obtains the information solely as a result of a privileged communication as provided in RCW 5.60.060."[13] RCW § 26.44.030(1)(b) (2024).

104.    RCW § 5.60.060, Washington's "Privileged Communications" statute, recognizes numerous privileges, including the spousal or domestic partner privilege, attorney-client privilege, the clergy-penitent privilege, peer supporter privilege, sexual assault advocate privilege, and alcohol or drug recovery sponsor privilege.

105.    But this May, Washington passed SB 5375, which both adds clergy to the State's list of mandatory reporters and removes the protection of the clergy-penitent privilege for mandatory reports. In

---

[13] This provision has been in place and untouched since enacted by SSB 5308, which was approved May 11, 2005, and effective July 24, 2005. 2005 Wash. Legis. Serv. Ch. 417 (S.S.B. 5308).

what this Complaint refers to as the *Clergy Discrimination Clause*, SB 5375 modified RCW § 26.44.030(1)(b) to explicitly exclude clergy—and only clergy—from being able to invoke the State's privileged communications statute, while leaving all secular privileges in RCW § 5.60.060 intact:

```
11    service. ((No)) Except for members of the clergy, no one shall be
12    required to report under this section when he or she obtains the
13    information solely as a result of a privileged communication as
14    provided in RCW 5.60.060.
```

106.  On May 2, 2025, Defendant Governor Ferguson signed the bill into law.

107.  The *Clergy Discrimination Clause* will become effective on July 27, 2025.

## C.    The duty to report under Washington's mandatory reporter law is both broad and vague.

108.  During committee hearings, one of the arguments made in support of revoking the privilege for clergy was that "the only people who need to worry about the privacy of their Confession are child rapists and abusers." (Feb 4, House, 1:05:19-25)[14]

109.  That statement is false. The duty to report under Washington law is broad and ill-defined.

110.  Under Washington law, a mandatory reporter must promptly inform "the proper law enforcement agency or to the

---

[14] Washington State Legislature, House Early Learning & Human Services Committee (Feb. 4, 2025, 1:30 PM), https://www.tvw.org/watch/?eventID=2025021151.

Complaint – 26

department" of Children, Youth, and Families when he or she "has reasonable cause to believe that a child has suffered abuse or neglect." RCW § 26.44.030(1)(a).

111.  This requirement is overbroad and vague, as underscored both by the law's definitions and what it leaves undefined. The law requires mandatory reports of a broad range of conduct, which incentivizes over reporting.

112.  As summarized by the Department of Children, Youth, and Families ("DCYF" or "Department"), which has the responsibility to investigate reports made under the mandatory reporting law, if "you are in doubt about what should be reported, it is better to make your concerns known than to remain silent." DCYF, *Protecting the Abused & Neglected Child* (Rev. 2018); RCW § 26.44.030(12)(a).

113.  For example, "'reasonable cause' means a person witnesses or receives a credible written or oral report alleging abuse, including sexual contact, or neglect of a child." RCW § 26.44.030(1)(b)(iii).

114.  "Credible" is not defined. *See* Julia Simon-Kerr, *Law's Credibility Problem*, 98 Wash. L. Rev. 179 (2023) ("Credibility determinations often seal people's fates. . . . Yet there is no stable definition of credibility in the law. Courts and agencies diverge at the most basic definitional level in their use of the category.").

115.  The Department has published guidance "to help mandated reporters understand" the law. *See* DCYF, *Protecting the Abused & Neglected Child* (Rev. 2018).

116.  But that guidance only furthers the breadth and vagueness of the law.

117.  According to the guidance, child abuse includes any "act that is likely to cause and which does cause bodily harm greater than transient pain or minor temporary marks or which is injurious to the child's health, welfare, and safety." *Id*. at 5.

118.  The guidance does not define transient or temporary. Nor does it define "health," "welfare," or "safety."

119.  According to the State's guidance, signs of child abuse include "sudden changes in behavior or school performance," "learning problems (or difficulty concentrating) that cannot be attributed to specific physical or psychological causes," and being "overly compliant, passive, or withdrawn." *Id*.

120.  According to the State's guidance, signs of child abuse also include a parent that "denies the existence of—or blames the child for—the child's problems in school or at home" or a parent that sees his or her child as "burdensome." *Id*.

121.  According to the State's guidance, signs of child neglect include a child that lacks "needed" immunizations. *Id*. at 4. The guidance does not define "needed."

122.  According to the State's guidance, mandatory reporters must also look for signs of "emotional maltreatment," which include a child who "shows extremes in behavior" or is "delayed in physical or emotional development." *Id.* at 5.

123.  Under Washington's mandatory reporter law, a "child" is any person under the age of eighteen. RCW § 26.44.020(2).

124.  Nothing in Washington's mandatory reporter law or in the Department's Guidance clarifies how mandatory reporters are to apply these factors differently to an infant, a five-year-old, and a seventeen-year-old.

### D.    Washington allows many secular privileges to override its mandatory reporter law.

125.  Washington's secular mandatory reporters include doctors, nurses, psychologists, pharmacists, dentists, medical examiners, law enforcement officers, child care providers, juvenile probation officers, professional school personnel, social service counselors, and employees of institutions of higher education. RCW §§ 26.44.020, 26.44.030(1)(a).

126.  Washington's mandatory reporter law defines "social service counselor" to include "anyone engaged in a professional capacity during the regular course of employment in encouraging or promoting the health, welfare, support, or education of children, or providing social services to adults or families, including mental health, drug and alcohol treatment, and domestic violence programs, whether in an individual

capacity, or as an employee or agent of any public or private organization or institution." RCW § 26.44.020(28).

127.   The *Clergy Discrimination Clause* facially discriminates against religion by treating clergy differently than the secular mandatory reporters listed in RCW 26.44.030. Other mandatory reporters are free to invoke any applicable privileged communication recognized in RCW 5.60.060, but clergy are categorically prohibited from invoking any privilege outlined in that statute in relation to their duties as a mandatory reporter.

128.   The *Clergy Discrimination Clause* also facially discriminates against religion by treating the clergy-penitent privilege—the only type of privileged communication specific to clergy—differently than the secular privileged communications listed in RCW 5.60.060.

129.   The secular privileged communications recognized by RCW 5.60.060 include the attorney-client privilege, peer supporter privilege, the sexual assault advocate privilege, and the alcohol or drug recovery fellowship privilege.

130.   Information learned from privileged attorney-client communications does not trigger mandatory reporting obligations. RCW §§ 5.60.060(2)(a), 26.44.030(1)(b).

131.   Washington recognizes a privilege for a "peer supporter" that prohibits them from being "compelled to testify about any communication made to the peer supporter by the peer support services

1  recipient while receiving individual or group services." RCW

2  § 5.60.060(6)(a). A "peer supporter" includes a "law enforcement officer,"

3  and such an officer is a mandatory reporter. RCW

4  §§ 5.60.060(6)(b)(1)(A), 26.44.030(1)(a). There is no exception to the

5  privilege for reporting obligations under RCW § 26.44.030.

6      132.  Washington recognizes a privilege for "sexual assault

7  advocate[s]" that prohibits them from being "examined as to any

8  communication made between the victim and the sexual assault

9  advocate" without the victim's consent. RCW § 5.60.060(7). Sexual

10  assault advocates are mandatory reporters. RCW § 26.44.020(28).

11  Sexual assault advocate services are available to any survivor of sexual

12  assault, including minors. There is no exception to the privilege for

13  reporting obligations under RCW § 26.44.030.

14      133.  Washington also recognizes a privilege for an "individual

15  who acts as a sponsor providing guidance, emotional support, and

16  counseling in an individualized manner to a person participating in an

17  alcohol or drug addiction recovery fellowship." RCW § 5.60.060(10).

18  That individual "may not testify in any civil action or proceeding about

19  any communication made by the person participating in the addiction

20  recovery fellowship to the individual who acts as a sponsor except with

21  the written authorization of that person." *Id.* These sponsors are

22  mandatory reporters, RCW § 26.44.020(28), but their privileged

23

communications are exempted from the mandatory reporting requirement.

### III.    The legislative history highlights the *Clergy Discrimination Clause*'s hostility to religion.

134.    The legislative history reveals the *Clergy Discrimination Clause*'s hostility toward religion in three key ways.

135.    First, Washington legislators emphasized that the *Clause* targets clergy—and only clergy—and rejected amendment after amendment that would have placed the clergy-penitent privilege on equal footing with secular privileges.

136.    Second, Washington legislators manifested the religious animus motivating the *Clause*. They also ignored warnings from concerned citizens about grave free exercise of religion violations.

137.    Third, at the same time the legislature considered and passed the *Clergy Discrimination Clause*, it also considered and passed a law confirming and expanding the attorney-client privilege exception to the mandatory reporting law.

### A.    Washington legislators passed the *Clergy Discrimination Clause* to target clergy.

138.    The Legislature repeatedly rejected amendments that would have placed the clergy-penitent privilege on equal or similar footing with secular privileges.

139.    It rejected:

Complaint – 32

1        a.    Amendment 5375 AMH ABEL WICM 723, which

2   would have ensured that Washington's mandatory reporter law

3   treated the clergy-penitent privilege and the attorney-client

4   privilege equally.[15]

5        b.    Amendment 5375 AMH DUFA WICM 724, which

6   would have ensured that Washington's mandatory reporter law

7   treated the clergy-penitent privilege and the spousal or domestic

8   partner privilege equally.[16]

9        c.    Amendment 5375 AMH WALJ WICM 717, which

10   would have simply affirmed that the Washington legislature

11   "intends that clergy be treated the same as other mandatory

12   reporters," acknowledges "that religious practices and religious

13   freedoms are protected by the Constitution of the United States,"

14   and "intends to respect church practices and sacred sacraments,

15   including the sacrament of penance and reconciliation."[17]

16        d.    Amendment 5375 AMS HS S1120.1, which would have

17   preserved a narrow clergy-penitent privilege under Washington's

18   mandatory reporter law.[18]

---

[15] 5375 AMH ABEL WICM 723, https://lawfilesext.leg.wa.gov/biennium/2025-26/Pdf/Amendments/House/5375%20AMH%20ABEL%20WICM%20723.pdf.
[16] 5375 AMH DUFA WICM 724, https://lawfilesext.leg.wa.gov/biennium/2025-26/Pdf/Amendments/House/5375%20AMH%20DUFA%20WICM%20724.pdf.
[17] 5375 AMH WALJ WICM 717, https://lawfilesext.leg.wa.gov/biennium/2025-26/Pdf/Amendments/House/5375%20AMH%20WALJ%20WICM%20717.pdf.
[18] 5375 AMS HS S1120.1, https://app.leg.wa.gov/committeeschedules/Home/Document/277885#toolbar=0&navpanes=0. *See also* 5375 AMH ESLI WICM 721

140.   During the Senate Human Services Committee meeting when the amendment narrowing the privilege was introduced, Senator Frame recognized that this amendment was "essentially the bill that [she] offered last year." (Feb. 5, Senate, 1:28:44).[19]

141.   In 2024, Senator Frame sponsored SB 6298, which like 2025's SB 5375 would have added clergy to the State's list of mandatory reporters.[20]

142.   SB 6298 preserved what Senator Frame described as a "narrowly defined" clergy-penitent privilege. (Feb. 16, House, 41:10).[21]

143.   In 2024, Senator Frame described SB 6298 as a "compromise solution" that she believed would not "caus[e] religious leaders to violate their faith traditions." (Feb. 16, House, 42:24).

144.   But in 2025, Senator Frame said that she "did not feel" that the same narrowed clergy-penitent privilege, proposed in 5375 AMS HS S1120.1, "was a compromise I can make this year. So I'm urging a no vote on this amendment. And I'll note my deep disappointment in the

---

(same, rejected during April 11, 2025, house floor debate), https://lawfilesext.leg.wa.gov/biennium/2025-26/Pdf/Amendments/House/5375%20AMH%20ESLI%20WICM%20721.pdf.

[19] Washington State Legislature, Senate Human Services Committee (Feb. 5, 2025, 8:00 AM), https://tvw.org/video/senate-human-services-2025021111/?eventID=2025021111.

[20] SB 6298, 2023-24 Leg., 2024 Regular Session (Wash.), https://app.leg.wa.gov/billsummary?BillNumber=6298&Initiative=false&Year=2023.

[21] Washington State Legislature, House Human Services, Youth & Early Learning (Feb. 16, 2025, 8:00 AM), https://tvw.org/video/house-human-services-youth-early-learning-2024021233/?eventID=2024021233

ranking member's offering of this amendment." (Feb. 5, Senate, 1:28:45-29:05).[22]

## B. The legislative history shows Washington's religious animus.

145.  The legislative history is replete with legislators showcasing their animus towards religion:

146.  Senator Frame told Seattle Auxiliary Bishop Frank Schuster that "You're failing us," and it is "traumatizing" to emphasize the importance of "religious freedom." (Jan. 28, Senate, 1:43:35).[23]

147.  She stated that the impact of the bishop's testimony "feels like an abusive relationship that we're in, where we are repeatedly abused and people keep saying sorry." (Jan. 28, Senate, 1:43:35).

148.  She also criticized Bishop Schuster for allegedly "patting himself on the back" after he recounted a prior incident where he acted as a mandatory reporter upon being told about covered abuse outside the Sacrament of Confession, while insisting on protecting the absolute confidentiality of Confession itself. (Jan. 28, Senate, 1:22:40). Nobody on the Senate Human Services Committee rebuked or objected to these comments.

---

[22] Washington State Legislature, Senate Human Services Committee (Feb. 5, 2025, 8:00 AM), https://tvw.org/video/senate-human-services-2025021111/?eventID=2025021111

[23] Washington State Legislature, Senate Human Services Committee (Jan. 28, 2025, 1:30 PM), https://www.tvw.org/watch/?eventID=2025011502.

149.  Senator Frame claimed that the *Clergy Discrimination Clause* was "about separation of church and state …. We can establish our laws, they can have their rules and if they are in conflict, I believe they can change their rules, not insist that we change our state laws …." (Mar. 14, House, 13:04-50).[24]

150.  Representative Lillian Ortiz-Self said, "I truly believe that you don't have religious freedom at the risk of hurting others…. My right to practice does not supersede the right of someone else to be safe…. So to me, it is critical that we pass legislation that is fair for all…." (Feb. 7, House, 13:34-14:35).[25]

151.  Rep. Goodman said that holding clergy to the same standards as attorneys made clergy's "threshold" for reporting abuse and neglect "too high." (Mar. 19, House, 26:10).[26]

152.  Numerous legislators and other concerned persons presented the grave religious freedom concerns but that the legislature nonetheless passed the *Clergy Discrimination Clause.*

---

[24] Washington State Legislature, House Early Learning & Human Services Committee (Mar. 14, 2025, 8:00 AM), https://tvw.org/video/house-early-learning-human-services-2025031189/?eventID=2025031189.

[25] Washington State Legislature, House Early Learning & Human Services Committee (Feb. 7, 2025, 8:00 AM), https://tvw.org/video/house-early-learning-human-services-2025021153/?eventID=2025021153.

[26] Washington State Legislature, House Early Learning & Human Services Committee (Mar. 19, 2025, 1:30 PM), https://tvw.org/video/house-early-learning-human-services-2025021153/?eventID=2025021153.

Complaint – 36

153.  Senator Christian stated that he would vote no on SB 5375 as written because it was unconstitutional. (Feb. 5, Senate).[27]

154.  David DeWolf, Professor Emeritus at Gonzaga Law School, warned a legislative committee that the *Clause* "not only [is] bad public policy, it's unconstitutional." (Feb. 4, House, 1:12:19).[28]

155.  Luke Esser, testifying on behalf of the Washington State Catholic Conference, said that the *Clause* "creates a double standard which would discriminate against the one testimonial privilege in our state based on religious speech and the free exercise of religion." (Mar. 14, House, 1:41:10-30).[29]

156.  Legislative hostility continued even after the *Clergy Discrimination Clause*'s passage.

157.  In an interview after Defendant Ferguson signed SB 5375 into law, Senator Frame claimed that "canon law has changed many times over the years in the Catholic faith. And there is nothing to say that they cannot change their rules to allow the reporting of, again,

---

[27] Washington State Legislature, Senate Human Services Committee (Feb. 5, 2025, 8:00 AM), https://tvw.org/video/senate-human-services-2025021111/?eventID=2025021111.

[28] Washington State Legislature, House Early Learning & Human Services Committee (Feb. 4, 2025, 1:30pm), https://www.tvw.org/watch/?eventID=2025021151.

[29] Washington State Legislature, House Early Learning & Human Services Committee (Mar. 14, 2025, 8:00 AM), https://www.tvw.org/watch/?eventID=2025031189.

1   real-time abuse and neglect of children. That is within their power to

2   change. And I think they should…."[30]

3       **C.   HB 1171: Washington retains existing secular**

           **privileges and expands the attorney-client privilege**

4              **exception.**

5       158.  Attorneys are not named as mandatory reporters under

6   Washington law.

7       159.  However, some attorneys are mandatory reporters because

8   they also function in a capacity that is designated as a mandatory

9   reporter. For example, law professors are mandatory reporters under

10  RCW § 26.44.030(f) when they are employees of institutions of higher

11  education.

12      160.  During the 2025 session, the Washington legislature

13  considered and passed another bill to amend the State's mandatory

14  reporting law, HB 1171.[31]

15      161.  The stated purpose of HB 1171 is "to exempt[] attorney

16  higher education employees from mandated reporting … as it relates to

17

18

19

20  ───────────────

[30] Sheraz Sadiq, *New Washington law making clergy mandatory reporters of abuse*

21  *draws investigation by US Justice Department,* OPB (May 14, 2025),

https://www.opb.org/article/2025/05/14/think-out-loud-washington-law-clergy-

mandatory-reporters-sb-5375-senator-noel-frame/.

22  [31] HB 1171, 2025-26 Leg., 2025 Regular Session (Wash.),

https://app.leg.wa.gov/BillSummary/?BillNumber=1171&Year=2025&Initiative=fals

23  e.

information gained in the course of providing legal representation to a client."[32]

162.  Section 1 of the bill recognizes that it is "vitally important" that "employees in higher education" fulfill their mandatory reporting duties.

163.  The second and third paragraphs of Section 1 expressed the Legislature's finding that it was "necessary" to clarify that the attorney-client privilege always trumps a law professor's duty as a mandatory reporter because otherwise "the values underlying the duty of lawyers to preserve the confidentiality of client information may be inadvertently undermined and violated."

164.  Likewise, legislators' and witnesses' comments on HB 1171 show the inconsistency with protecting the relevant attorney-client privilege while sacrificing the clergy-penitent privilege.

165.  Representative Gerry Pollett, an attorney and HB 1171's primary sponsor, stressed the "very serious conflict" between an attorney's professional responsibilities and the mandatory reporting law, which he warned "could eliminate any participation from the law school clinics." (Feb. 5, House, 21:03).[33]

---

[32] SHB 1171 at 1:1-4, https://lawfilesext.leg.wa.gov/biennium/2025-26/Pdf/Bills/House%20Bills/1171-S.pdf?q=20250515232549.

[33] Washington State Legislature, House Early Learning & Human Services Committee (Feb. 5, 2025, 1:30 PM), https://tvw.org/video/house-early-learning-human-services-2025021152/?eventID=2025021152.

166.  In response to a colleague's objection that the bill was inconsistent with the elimination of the relevant clergy-penitent privilege, Rep. Pollett said that the expanded attorney-client privilege "is narrow." (Mar 17, House, 17:15).[34]

167.  Professor Paul Holland, a member of the faculty at Seattle University School of Law, testified that HB 1171 was "necessary so that students and faculty representing clients through clinics in the state's three law schools can maintain compliance with their professional ethical obligation." (Mar 17, House, 27:40). Professor Holland represented that the "vital safety interest [in protecting children] will not be compromised by allowing faculty who are lawyers to protect confidential client information." (Mar 17, House, 28:57).

168.  On April 30, Governor Ferguson signed HB 1171 into law.

## IV.  Washington is now the only state whose mandatory reporter law explicitly eliminates the relevant privilege for clergy while retaining the secular attorney-client privilege.

169.  Every state has a mandatory reporter law.

170.  More than forty states have made clergy mandatory reporters.

171.  But Washington is the only state to have explicitly abolished the clergy penitent exception to the mandatory reporting law while retaining secular privilege exemptions.

---

[34] Washington State Legislature, Senate Human Services (Mar. 17, 2025, 1:30 PM), https://tvw.org/video/senate-human-services-2025031343/?eventID=2025031343.

172.  Though six other states' mandatory reporting laws (Oklahoma, Rhode Island, North Carolina, Tennessee, West Virginia, and Texas) *might* override the clergy-penitent privilege, none of those laws mirror Washington's.

173.  Washington's mandatory reporter law shares some (but not all) features of the laws of those other states:

a.    **Like Tennessee and West Virginia**, Washington lists professions as mandatory reporters.

b.    **Like West Virginia**, Washington specifically designates clergy as mandatory reporters; the other states cover clergy through a general provision that requires anyone to report.

c.    **Like Texas**, Washington explicitly abrogates privilege for clergy; the other states have general provisions that might exclude the clergy-penitent privilege.

d.    Finally, **like Rhode Island, North Carolina, Tennessee, and West Virginia**, Washington preserves the secular attorney-client privilege.

174.  However, only Washington's mandatory reporter law has all four of these characteristics:

| | Lists some professions as mandatory reporters | Clergy named as mandatory reporters | Penitential privilege explicitly revoked | Attorney-client privilege still honored |
|---|---|---|---|---|
| Oklahoma | N | N | N | N |
| Rhode Island | N | N | N | Y |
| North Carolina | N | N | N | Y |
| Tennessee | Y | N | N | Y |
| West Virginia | Y | Y | N | Y |
| Texas | N | N | Y | N |
| Washington | Y | Y | Y | Y |

175.  This comparison shows that Washington's mandatory reporter law, as amended by SB 5375, is unlike any other mandatory reporting law. Only Washington knowingly and explicitly makes it a crime for clergy to break their religious duty to maintain the absolute confidentiality of Confession, while at the same time respecting the attorney-client privilege and all other secular privileged communication recognized under state law.

176.  There is no evidence that any of these six states have attempted to enforce their mandatory reporting laws against clergy who have honored their religious duty to maintain the confidentiality of Confession.

Complaint – 42

177.   No court has held that a state's mandatory reporter law may override the clergy-penitent privilege.

178.   The vast majority of states have found that they can advance their compelling interest in protecting children without making it illegal for priests to honor their religious duty to maintain the confidentiality of Confession.

**V.    SB 5375 burdens religious exercise**

179.   The failure to make a mandatory report under RCW § 26.44.030 is a gross misdemeanor, a criminal offense punishable with up to 364 days imprisonment, up to a $5,000 fine, or both. RCW §§ 26.44.080, 9.92.020. Failure to report may also expose a mandatory reporter to civil tort liability. *See Evans v. Tacoma Sch. Dist. No. 10*, 380 P.3d 553, 561 (Wash. Ct. App. 2016).

180.   The *Clergy Discrimination Clause* burdens Plaintiffs' religious exercise because each of the Plaintiff Church's priests and Plaintiff Wilkinson must either violate his religious convictions or face criminal punishment and civil liability.

181.   The *Clergy Discrimination Clause* also burdens Plaintiffs' religious exercise because it impedes their ability to carry out their religious duties as spiritual fathers to the people whose spiritual wellbeing is entrusted to their care.

182.   Plaintiffs believe they have a religious duty to address and remove impediments that chill those whom they serve from being able to access the sacrament of Confession.

183.   Plaintiffs believe they have a religious duty to follow the example of Christ, the "good shepherd" who "lays down his life for his sheep," (John 10:11) and who would leave his ninety-nine sheep to search after the one that is lost (Luke 15:4). Plaintiffs take to heart Jesus' teaching that "there will be more joy in heaven over one sinner who repents than over ninety-nine righteous persons who need no repentance." (Luke 15:7).

184.   As such, Plaintiffs' religious exercise is substantially burdened every time anyone under their pastoral care is dissuaded from coming to the Sacrament of Confession because of the *Clergy Discrimination Clause*, or who holds back any sin because of the *Clergy Discrimination Clause's* chilling effect.

185.   Plaintiffs believe this is true not only for those who may confess their sins in a quest to obtain forgiveness from God (cf. John 20:23; James 5:16), but also all those who come to the Sacrament of Confession in search of spiritual healing after having been hurt by the sins of others. Extraordinarily sensitive communications are made in a sacramental Confession precisely because the speaker is aware of the well-known and firmly established rule mandating the absolute confidentiality of such sacred conversations.

186.   Plaintiffs reasonably believe that the *Clergy Discrimination Clause's* chilling effect is even greater on the families they serve who have come to America from other parts of the world—including Russia and the former Soviet Union, Turkey, and Syria—where oppressive governments have practiced surveillance over Christian parishes, including monitoring homilies, tracking attendees, and coercing priests into serving as government informants.

187.   Plaintiffs reasonably believe that the *Clergy Discrimination Clause*, in light of the broad and ill-defined terms in Washington's mandatory reporter law and related guidance, will chill their parishioners' willingness to confess a wide range of sins.

188.   Plaintiffs reasonably believe that the *Clergy Discrimination Clause* will likewise chill children's willingness to be candid with their priests in Confession about a wide range of matters because the mandatory reporting law's vague and overbroad terms require clergy to report a vast array of conduct that may or may not constitute criminal behavior.

**COUNT I**
**VIOLATION OF THE FREE EXERCISE CLAUSE**
**OF THE FIRST AMENDMENT TO THE UNITED STATES**
**CONSTITUTION**
**(42 U.S.C. § 1983)**

189.   Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–188 above as if fully set forth here.

Complaint – 45

190.  The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the state from abridging Plaintiffs' rights to free exercise of religion.

191.  The *Clergy Discrimination Clause*, on its face and as applied, targets Plaintiffs' sincerely held religious convictions and duties by facially targeting religion, embodying animus towards religion, and treating other practices more favorably than religious ones.

192.  Laws that burden the exercise of religion must meet strict scrutiny, the most rigorous test in constitutional law.

193.  Laws that burden the exercise of religion must at least be both neutral and generally applicable to avoid strict scrutiny.

194.  The *Clergy Discrimination Clause* burdens Plaintiffs' sincerely motivated exercise of religion. It puts Plaintiffs to the choice between following their sincere religious obligation to maintain the confidentiality of Confession and violating SB 5375, which is a gross misdemeanor, or following SB 5375 and violating their obligation to maintain the confidentiality of confession, risking serious canonical penalties, including removal from the priesthood to which they have devoted their lives.

195.  This burden stands out all the more because the Washington legislature explicitly avoided imposing on secular professions, including

1  lawyers a comparable Hobson's choice—between the duty to report and

2  a professional obligation.

3      196.  For a law to be "generally applicable," the government must

4  not treat comparable secular activity more favorably than the burdened

5  religious exercise.

6      197.  A law is not "neutral" if it targets religious beliefs as such or

7  if the object or purpose of a law is the suppression of religious conduct.

8      198.  The *Clergy Discrimination Clause* is neither neutral nor

9  generally applicable, both on its face and as applied.

10     199.  The *Clergy Discrimination Clause* is not neutral because it

11 facially targets Plaintiffs' sincerely motivated religious obligation to

12 maintain the absolute confidentiality of Confession.

13     200.  The *Clergy Discrimination Clause* explicitly forbids

14 "members of the clergy"—and *only* members of the clergy—from

15 invoking an otherwise available evidentiary privilege as codified in

16 RCW § 5.60.060.

17     201.  The *Clause* also flunks neutrality because Washington

18 passed it out of religious animus.

19     202.  Senator Frame stated that religious communities should

20 "change their rules, not insist that we change our state laws."

21     203.  Yet the Washington Legislature, during the same session,

22 passed another law that changed Washington's mandatory reporter law

23 to accommodate the secular attorney-client privilege.

204.  The *Clergy Discrimination Clause* is not generally applicable because it exempts secular conduct that risks undermining any asserted government interest at least as much as, and in reality more than, priests abiding their religious duty to maintain the inviolability of the confidentiality of confession.

205.  Secular attorneys are categorically exempt from the mandatory reporting requirement.

206.  Exempting attorneys, but not priests, undermines SB 5375's general applicability and triggers strict scrutiny.

207.  The *Clergy Discrimination Clause* is not the least restrictive means of achieving an otherwise permissible government interest.

208.  Eliminating the clergy-penitent privilege is not necessary or narrowly tailored to advance the state interests that support mandatory reporting laws for at least five reasons.

209.  First, Defendants could have made clergy mandatory reporters without eliminating the privilege, as most states have done.

210.  Second, as a legislator conceded, the similar attorney-client privilege is a "narrow" exception. The clergy-penitent privilege is likewise a "narrow" exception to the mandatory reporting law that is necessary to respect fundamental religious exercise.

211.  Third, independent of legal obligations, Plaintiffs already report suspected abuse and neglect that they discovery *outside* the context of Confession or other privileged communications, and they

otherwise take steps to promote justice for children who may have suffered abuse or neglect.

212.   Fourth, the *Clergy Discrimination Clause*'s vague and broad terms require clergy, on threat of criminal liability, to report a large range of behavior that is not necessarily criminal. It thus requires clergy to break the confidentiality of Confession in many cases. To paraphrase the Department, when in doubt, clergy should report.

213.   Fifth, the *Clergy Discrimination Clause*'s vague and broad terms will dissuade penitents from confessing a wide variety of behavior that may or may not constitute criminal behavior. If penitents do not confess these sins, Plaintiffs will have no opportunity to help them make amends and reconcile them to God, both of which are critical parts of their religious exercise.

214.   The *Clergy Discrimination Clause*, on its face and as applied, will cause irreparable harm and actual and undue hardship to Plaintiffs from violation of their sincerely held religious obligation to categorically maintain the inviolable confidentiality of Confession.

215.   Plaintiffs have no adequate remedy at law to prevent the violation of their constitutional liberties and sincerely held religious beliefs.

## COUNT II
### VIOLATION OF THE FREE EXERCISE AND ESTABLISHMENT CLAUSES OF THE FIRST AMENDMENT, CHURCH AUTONOMY (42 U.S.C. § 1983)

216.  Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–188 above as if fully set forth here.

217.  The Free Exercise Clause and Establishment Clause of the First Amendment ("Religion Clauses"), as applied to the states by the Fourteenth Amendment, prohibit the State from abridging the fundamental "autonomy" of religious institutions.

218.  The Religion Clauses protect the right of churches and other religious institutions to decide matters of faith and doctrine without government intrusion.

219.  Churches have autonomy over questions of discipline, or of faith, or ecclesiastical rule, custom, or law.

220.  The First Amendment protects churches' independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.

221.  The *Clergy Discrimination Clause*'s encroachment on the confidentiality of Confession violates church autonomy by directly interfering with Plaintiffs' centuries-old internal decision to maintain confessional secrecy to carry out Jesus's explicit instructions to forgive the sins of repentant sinners.

222. The *Clergy Discrimination Clause* thus interferes with Plaintiff Churches on a critical matter of "faith and doctrine" and directly inhibits the "faith and mission of the church itself," *i.e.*, its direct scriptural call to facilitate the forgiveness of the sins of penitents.

223. As Senator Frame stated in her closing speech on the Senate floor, the *Clergy Discrimination Clause* effectively requires "religious communit[ies] to change their rules" with respect to the confidentiality of Confession.

224. Accordingly, the *Clergy Discrimination Clause*, on its face and as applied, will cause irreparable harm to Plaintiffs and their penitents.

225. Plaintiffs have no adequate remedy at law for the deprivation of their rights under the Religion Clauses of the First Amendment.

## COUNT III
### VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION
### (42 U.S.C. § 1983)

226. Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–188 above as if fully set forth here.

227. The Fourteenth Amendment to the United States Constitution guarantees Plaintiffs' right to equal protection under the law.

Complaint – 51

228.   The Equal Protection Clause requires heightened judicial scrutiny for both unequal treatment of a protected class and unequal treatment based on a fundamental right.

229.   The *Clergy Discrimination Clause* burdens Plaintiffs' fundamental First Amendment rights and targets a suspect class (*i.e.*, religious adherents).

230.   The free exercise of religion, as the first right in the U.S. Constitution's enumerated Bill of Rights, is a fundamental right.

231.   By mandating disclosures from clergy while exempting the same disclosures from attorneys, peer supporters, sexual assault advocates, and alcohol or drug recovery sponsors, the *Clergy Discrimination Clause* targets religious adherents.

232.   Clergy are similarly situated to attorneys, peer supporters, sexual assault advocates, and alcohol or drug recovery sponsors for purposes of retaining privilege with respect to mandatory reporting obligations.

233.   The *Clergy Discrimination Clause* must thus meet strict scrutiny, which requires Defendants to show that it is the least restrictive means to achieve a compelling government interest.

234.   The *Clergy Discrimination Clause* fails strict scrutiny under the Equal Protection Clause for the same reasons discussed under Count I. *See supra* ¶¶ 207–13.

235. There is no rational, legitimate, or compelling interest in SB 5375's application of different standards to different, similarly situated individuals in Washington.

236. The *Clergy Discrimination Clause*, on its face and as applied, will cause irreparable harm to Plaintiffs and their penitents.

237. Plaintiffs have no adequate remedy at law for the deprivation of their rights under the Equal Protection Clause.

## COUNT IV
## VIOLATION OF THE FREE SPEECH CLAUSE OF THE FIRST AMENDMENT, COMPELLED SPEECH
## (42 U.S.C. § 1983)

238. Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–188 above as if fully set forth here. The First Amendment's Free Speech Clause prohibits Defendants from compelling speech. Compelled speech imposes greater harm than censorship, and so requires an even more urgent justification.

239. The *Clergy Discrimination Clause* compels Plaintiffs' speech by mandating that they report what they learned during Confession.

240. The *Clergy Discrimination Clause* compels Plaintiffs to speak about what they heard during Confession—speech that their religion mandates must remain confidential.

241. State action compelling speech, like the *Clergy Discrimination Clause*, is unconstitutional.

242.  The *Clergy Discrimination Clause* must meet at least strict scrutiny, which requires Defendants to show it is the least restrictive means to a compelling government interest.

243.  State action that compels speech inherently discriminates based on content, meaning it triggers strict scrutiny for that independent reason.

244.  The vague and broad terms employed by Washington's mandatory reporting law grant Washington officials unbridled discretion to discriminate against Plaintiffs and other similarly situated in enforcing the law.

245.  Unbridled discretion is impermissible viewpoint discrimination, which is unconstitutional and at least triggers strict scrutiny.

246.  The *Clause* fails strict scrutiny for the reasons discussed above. *See supra* ¶¶ 207–13.

247.  Accordingly, the *Clergy Discrimination Clause*, on its face and as applied, will cause irreparable harm to Plaintiffs and their penitents.

248.  Plaintiffs have no adequate remedy at law for the deprivation of their rights under the First Amendment.

## COUNT V
## VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION
## (42 U.S.C. § 1983)

249.  Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1–188 above as if fully set forth here.

250.  The Fourteenth Amendment to the United States Constitution guarantees Plaintiffs' right to due process.

251.  Due process requires that people of ordinary intelligence be able to understand what conduct a given statute prohibits.

252.  A statute that fails to provide this fair notice and clear guidance is void for vagueness.

253.  A statute that authorizes or even encourages arbitrary or discriminatory enforcement is void for vagueness.

254.  The *Clergy Discrimination Clause* threatens criminal penalties for failing to comply with Washington's vague terms.

255.  Washington's mandatory reporting law requires reports of a broad range of conduct, which incentivizes over reporting.

256.  For example, Washington does not define what a "credible" allegation is.

257.  Washington does not define what are "transient" or "temporary" events that do not trigger the mandatory reporting law.

258.  Washington does not define what "health, welfare, or safety" means so as to trigger the mandatory reporting duty.

259.  Nothing in Washington's mandatory reporter law or in the Department's Guidance clarifies how the mandatory reporting duty differs, if at all, to an infant, a five-year-old, and a seventeen-year-old.

260.  Plaintiffs and others must thus guess as to what duties they have under the mandatory reporting law.

261.  These vague terms under Washington law encourage arbitrary and discriminatory enforcement of the mandatory reporting law, including against Plaintiffs.

262.  Thus, removing privileged communications exemptions to the mandatory reporting requirement for Plaintiffs is void for vagueness and violates Plaintiffs' Fourteenth Amendment rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for relief as follows as to all Counts:

(A). A statewide temporary restraining order and/or preliminary injunction, followed by a permanent injunction, restraining and enjoining the Defendants, their officers, agents, employees, attorneys and successors in office, and all other persons in active concert or participation with them, from enforcing, threatening to enforce, attempting to enforce, or otherwise requiring compliance with the *Clergy Discrimination Clause* in RCW § 26.44.030(1)(b) facially and as applied to Plaintiffs and all others similarly situated;

Complaint – 56

(B). A declaratory judgment declaring that the *Clergy Discrimination Clause*, both on its face and as applied to Plaintiffs and all others similarly situated, is unconstitutional under the First and Fourteenth Amendments.

(C). An award of reasonable costs and expenses of this action, including a reasonable attorney's fee, in accordance with 42 U.S.C. § 1988; and

(D). Such other and further relief as the Court deems equitable and just under the circumstances.

Dated: June 16, 2025                    Respectfully submitted,


                                        */s/ Katherine Anderson*

Eric Kniffin*                           Kristen K. Waggoner
CO Bar 48016                            WA Bar No. 27790
KNIFFIN LAW PLLC                        AZ Bar No. 32382
102 S. Tejon St., Suite 1100            Katherine Anderson
Colorado Springs, CO 80903              WA Bar No. 41707
(719) 212-4391                          AZ Bar No. 29490
eric@kniffin.law                        Ryan Tucker*
                                        AZ Bar No. 034382
George M Ahrend                         Mark Lippelmann*
WA Bar No. 25160                        AZ Bar No. 036553
AHREND LAW FIRM PLLC                    ALLIANCE DEFENDING FREEDOM
421 W. Riverside Ave.                   15100 N. 90th Street
Suite 1060                              Scottsdale, AZ 85260
Spokane, WA 99201                       Telephone: (480) 444-0020
Telephone: (206) 467-6090               kwaggoner@ADFlegal.org
George@luveralawfirm.com                kanderson@ADFlegal.org
                                        rtucker@ADFlegal.org
                                        mlippelmann@ADFlegal.org

Complaint – 57

John J. Bursch
MI Bar No. P57679
Mathew W. Hoffmann*
VA Bar No. 100102
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
*Counsel for Plaintiffs*                    jbursch@ADFlegal.org
mhoffmann@ADFlegal.org

David A. Cortman
GA Bar No. 188810*
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
Telephone: (770) 339-0774
dcortman@adflegal.org

*Motion for admission *Pro Hac Vice* filed concurrently

Complaint – 58